IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

JODIE L. TURNER,

        Plaintiff,

v.                                                  Civil Action No.: 5:08-CV-142
                                                    JUDGE STAMP

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [12], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.     INTRODUCTION

On September 15, 2008, Plaintiff Jodie L. Turner ("Plaintiff"), by counsel Susan Kipp

McLaughlin, Esq., filed a complaint in this Court to obtain judicial review of the final decision of

Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner") pursuant to

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).  On January 28, 2009,

the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed

an answer and administrative transcript of the proceedings.  On March 2, 2009 and March 26, 2009,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [10] [12].

Following review of the motions by the parties and the transcript of administrative proceedings, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A. Procedural Background

On February 28 and March 2, 2006, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability since June 30, 2005. *See* Tr. at 84, 170, & 175. On October 3, 2007, the Administrative Law Judge ("ALJ") held a hearing ("ALJ Hearing"), and Plaintiff testified under oath. Tr. at 43-73. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). On January 10, 2008,[1] the ALJ issued an unfavorable decision to the Plaintiff, finding her not entitled to disability insurance benefits and supplemental security income. Tr. at 90.

### B. Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g). "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidenc,e. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962). Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility

---

[1] The ALJ decision was date stamped 2007, but this was the incorrect year. *See* "Notice of Appeals Council Action" dated July 11, 2008, referencing the January 10, 2008 decision by the ALJ. Tr. at 1.

of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979). **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). With these standards in mind, the Court reviews the decision by the ALJ.

## C.    Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:     Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:     Determine whether the plaintiff has a severe impairment;

Step Three:     Determine whether the plaintiff has "listed" impairment;

* Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:      Compare residual functional capacity assessment to determine whether the

plaintiff can perform past relevant work;

Step Five:      Consider residual functional capacity assessment, age, education, and

work experience to determine if the plaintiff can perform any other

work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general).  In following the five-step process

and coming to a decision, the ALJ makes findings of fact and conclusions of law.  This Court will

review the decision by the ALJ to determine whether it is supported by substantial evidence, in

accordance with 42 U.S.C. § 405(g) and *Hays*.

## D.      Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence

### 1.      Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

Substantial gainful activity is work activity that is both substantial
and gainful:

(a) Substantial work activity. Substantial work activity is work
activity that involves doing significant physical or mental activities.
Your work may be substantial even if it is done on a part-time basis
or if you do less, get paid less, or have less responsibility than when
you worked before.

(b) Gainful work activity. Gainful work activity is work activity that
you do for pay or profit. Work activity is gainful if it is the kind of
work usually done for pay or profit, whether or not a profit is
realized....

Generally, in evaluating your work activity for substantial gainful

> activity purposes, our primary consideration will be the earnings you
> derive from the work activity...
>
> If you are working and the work you are doing is substantial gainful
> activity, we will find that you are not disabled ***regardless of your
> medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a)(1) (evaluation guide for employees who

are not self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added).

Plaintiff previously applied for disability and supplemental security income August 2005.

*See* Letter from Plaintiff, Date Stamped Mar. 12, 2008, Tr. at 9; *see also* Tr. at 202 & 218.  In

November 2005, her claims were denied because she continued to engage in substantial gainful

activity.  *See* Tr. at 202 & 218.  Plaintiff did not appeal this decision.  *See* Tr. at 202 & 218.

For the current disability and supplemental security income claims filed February 28 and

March 2, 2006, the ALJ found that Plaintiff had engaged in substantial gainful activity from the

alleged date of disability on June 30, 2005 until January 2006.  Tr. at 79.  The ALJ noted that since

1996, Plaintiff has worked for the same employer, Carl E. Nichols, M.D., who is also her treating

physician.  Tr. at 85 & 81; Comm'r. Doc. 13 at 3; Pl. Doc. 11 at 2.  Plaintiff earned $24,797 in 2005,

and she admitted to working 50-60 hours per week until August 2005.  Tr. at 81 & 414.  In addition,

in June 2005 and for the months following Plaintiff's alleged date of disability on June 30, 2005,

Plaintiff reported earning: June $2,688; July $1025; August $1,835; September $1,659; October

$4,100; November $2,050; December $1,566; and in January 2006 $738.  Tr. at 79-80 & 207.

Under Social Security Regulations for 2006, $10,320 per year ($860 per month) is considered

"substantial gainful activity."  Tr. at 80.  Plaintiff's earnings in 2006 were $9,600 (averaging $800

per month).  Tr. at 80.  Therefore, the ALJ found that Plaintiff was engaged in substantial gainful

activity from her alleged date of disability on June 30, 2005 until January 2006.  The parties do not

dispute ALJ's findings in Step One.  Comm'r. Doc. 13 at 3; Pl. Doc. 11 at 2.

### 2.    Step Two: Determine whether the Plaintiff has a Severe Impairment

> [A] severe impairment...is any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...

> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.  Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs.  Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989).  The ALJ found Plaintiff to have the following severe impairments: "mild" bilateral carpal tunnel syndrome, history of Raynaud's syndrome, "mild" degenerative disc disease, history of Crohn's disease (in remission), history of gastroesophageal reflux disease ("GERD"), scleroderma (by report), fibromyalgia, chronic fatigue syndrome, and "mild" anxiety / depression / adjustment disorder.  Tr. at 82.  The parties do not dispute ALJ's findings in Step Two.  Comm'r. Doc. 13 at 4; Pl. Doc. 11 at 2.

### 3.    Step Three: Determine whether the Plaintiff has a "Listed" Impairment

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

> The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

Most of the listed impairments are permanent or expected to result in death.  *See* 20 C.F.R. § 404.1525(a).

We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s).  *See* 20 C.F.R. § 404.1513(a).

To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing.  *See* 20 C.F.R. § 404.1513(a) (emphasis added).

***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***.  *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

The ALJ found that Plaintiff's severe impairments do not meet the criteria to qualify as listing impairments.  Tr. at 83.  The parties do not dispute ALJ's findings in Step Three.

### * Residual Functional Capacity Assessment *
### (Needs to be Determined Before Proceeding to Step Four)

If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

Residual functional capacity assessment.  Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is the most you can still do despite your limitations.  We will assess your residual functional capacity based on all the relevant evidence in your case record....

Residual functional capacity is a measurement of the most a claimant can do despite his limitations.  *See* 20 C.F.R. § 404.1545(a).  According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means

> 8 hours a day, for 5 days a week, or an equivalent work schedule.
> Social Security Regulation (SSR) 96-8p. Residual functional
> capacity is to be determined by the ALJ only after he considers all
> relevant evidence of a claimant's impairments and any related
> symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d

559 (4th Cir. 2006). The ALJ found that Plaintiff has the residual functional capacity to perform

light work. Tr. at 83-84.

> Light work involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this
> category when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable of
> performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities.

*See* 20 C.F.R. § 404.1567(b). Specifically, the ALJ found that Plaintiff had the residual functional

capacity to perform a range of "unskilled" work activity within a low stress environment that

requires no more than light exertion; that affords the option to sit or stand; that requires no climbing

of ladders, ropes, or scaffolds, or more than occasional performance of other postural movements;

that requires no constant or repetitive fine manipulation maneuvers; that entails no concentrated

exposure to temperature extremes or environmental pollutants (e.g., dust, fumes, gases, noxious

chemicals / odors, smoke); that entails no exposure to hazards (e.g., dangerous moving machinery,

unprotected heights); that entails no production line type of pace, independent decision making

responsibilities or supervisory duties; and that involves only routine and repetitive instructions and

tasks. Tr. at 83-84.

Plaintiff contends that she is greatly impaired, both physically and cognitively, and is unable

to perform any substantial gainful activity. Pl. Doc. 11 at 8. The ALJ considered Plaintiff's medical

evidence, impairments,[2] physical and mental limitations, pain symptoms, daily activities, and the credibility of Plaintiff and her primary treating doctor in finding that Plaintiff has the residual functional capacity to perform light work.

### a. Plaintiff's Medical Evidence from Treating Sources other than her Primary Treater

"In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." *See* 20 C.F.R. § 404.1527(b). The ALJ reviewed Plaintiff's entire medical history in considering her residual functional capacity.

In October 2000, Victor Villarreal, M.D. evaluated Plaintiff in regards to her complaints of a swollen lymph node. Tr. at 264. Plaintiff reported to Dr. Villarreal that she has been bothered with chronic fatigue. Tr. at 264. In May 2001, Leonard Calabrese, D.O., a rheumatologist, evaluated Plaintiff for her chronic fatigue. Tr. at 271-74. Plaintiff told Dr. Calabrese that she developed chronic fatigue approximately three and one half years prior (1997), following the birth of her last child. *See* Tr. at 273. Plaintiff advised Dr. Calabrese that she had difficulties with memory and concentration. Tr. at 273. Plaintiff said she is working full-time but she has to work harder to make the same type of decisions that she made before her illness. Tr. at 273. Plaintiff also said she has developed arthralgias and mylagias. Tr. at 273.

Dr. Calabrese reported that the physical exam was "non-contributory," and laboratory studies including a CBC, complete metabolic profile, acute phase reactants, rheumatoid factor, antinuclear antibody, and thyroid screening were all normal. Tr. at 271. In June 2001, Plaintiff underwent a

---

[2] *See supra* discussion of Plaintiff's severe impairments in Section II.D.2 of this Report and Recommendation.

sleep study, which Dr. Calabrese found to be "unremarkable;" Michael Morehead, M.D. also reviewed the sleep study and found it "non-diagnostic." Tr. at 266 & 271. Dr. Calabrese reported that he was "quite confident" that Plaintiff's symptoms did represent chronic fatigue syndrome. Tr. at 271. Dr. Calabrese said that chronic fatigue syndrome is serious but potentially reversible. Tr. at 271. Dr. Calabrese recommended medication, a graduated walking program, and a balanced diet. *See* Tr. at 271.

In August 2005, Robert Gustke, M.D. performed a colonoscopy on Plaintiff, and he reported that the examination was essentially normal and her Crohn's disease was in remission. Tr. at 277. In December 2006, G.S. Brar, M.D., a rheumatologist, evaluated Plaintiff for her complaints of fatigue. Tr. at 410. Plaintiff told Dr. Brar that she has had these complaints since 1997. Tr. at 410. Plaintiff said that her only current medication was birth control. Tr. at 410. Dr. Brar noted that Plaintiff was positive for 18 out of 18 fibromyalgia trigger point locations. Tr. at 410. Dr. Brar diagnosed Plaintiff with chronic fatigue syndrome / fibromyalgia. Tr. at 410. Dr. Brar's recommended treatment was a program of muscle toning and muscle strengthening and to continue her current medications (i.e., birth control). Tr. at 410. In February 2007, Dr. Brar wrote a brief letter stating Plaintiff could work on a part-time basis. Tr. at 409.

In April 2007, Kathy Worthington, M.D. conducted a "Comprehensive Psychiatric Evaluation." Tr. at 414-17. Plaintiff told Dr. Worthington that she has been very tired since her daughter's birth in 1997. Tr. at 414. Plaintiff advised that until August 2005, she was working 50-60 hours per week. Tr. at 414. Plaintiff reported currently working 10 hours a week. Tr. at 414. Plaintiff said that she has never been to a psychiatrist or counseling. Tr. at 414. Plaintiff said her current medications were birth control and "herbals." Plaintiff said that the herbals help her sleep,

and she feels rested upon arising. Tr. at 415. She also said that she has felt better than she had felt in a while, and she attributed this to the herbals. Tr. at 415. Dr. Worthington diagnosed Plaintiff with adjustment disorder but reported that Plaintiff is not showing signs or symptoms of depression. Tr. at 415. Dr. Worthington did not think it was appropriate to prescribe medication at this time. Tr. at 415.

### b. Plaintiff's Medical Evidence from her Primary Treater and Employer, Dr. Nichols

Since August 1996, Dr. Nichols has been Plaintiff's primary treating physician and employer. *See* Letter from Dr. Nichols to ALJ, Sept. 19, 2007, Tr. at 461; *see also* Work Activity Report, Tr. at 206. Plaintiff's medical evidence from Dr. Nichols includes voluminous treatment notes, several letters written by Dr. Nichols, and two "Medical Assessment" forms completed by Dr. Nichols. Tr. 290-408, 411-13, 419-457, 461, & 496.

In October 2005, Dr. Nichols wrote a letter referencing Plaintiff's first social security claim. Tr. at 305. Dr. Nichols indicated that Plaintiff has suffered from "extreme fatigue" since the birth of her daughter in 1997. Tr. at 305. Dr. Nichols noted that Plaintiff has "frequent absences" and "requires rest periods." Tr. at 305. Dr. Nichols stated that in May 2004, Plaintiff was diagnosed with Crohn's disease, (Tr. at 305) now in remission (Tr. at 277).

In March 2007, Dr. Nichols wrote a letter directly to Chief Administrative Law Judge for the Office of Disability Adjudication and Review. Tr. at 411-12. In this letter, Dr. Nichols indicated that Plaintiff has chronic fatigue immune dysfunction syndrome with myalgias; fibromyalgia with degenerative disc disease of the cervical, thoracic, and lumbar spine; Crohn's disease with esophageal, small bowel, and large bowel manifestations; and bilateral carpal tunnel syndrome. Tr. at 411. Due to these impairments, Dr. Nichols stated that Plaintiff has below average strength in her

hands, is unable to sit, stand, or walk for more than 15-20 minutes at a time, and cannot tolerate loud noise, bright or fluorescent light, or cold temperatures. Tr. at 411. Nevertheless, Dr. Nichols noted that Plaintiff continues to work ten hours or less per week at home "at her convenience." Tr. at 411. Finally, Dr. Nichols requested that the ALJ give Plaintiff's hearing "priority status" due to her financial stress, and he submitted Plaintiff's financial documents including a bankruptcy order, bank statements, mortgage payment assistance, utility shut-off notices, heating assistance, delinquent medical bills, and hospital charity care agreements. Tr. at 412.

In September 2007, Dr. Nichols wrote a letter directly to Honorable Karl Alexander, the ALJ who presided over Plaintiff's case. Tr. at 461-63. In the letter, Dr. Nichols indicated that Plaintiff's current diagnoses were fibromyalgia, chronic fatigue immune dysfunction, and Crohn's disease. Tr. at 461. Dr. Nichols indicated that Plaintiff experiences decreased strength of her intrinsic hand muscles, fatigue, gastro-intestinal flare-ups, moderate to severe pain, dyspnea, cognitive dysfunction, and an inability to tolerate cold temperatures. Tr. at 461-63. Attached to Dr. Nichols letter are a variety of objective test results: a substantial decrease in finger tip pinch and grip strength between June 2006 and March 2007, mild carpal tunnel syndrome on the left, mild to moderate carpal tunnel syndrome on the right, normal spirometry, normal lung volumes, mildly reduced diffusion capacity, mild to moderate decrease in primary peristalsis, mild GERD, benign tiny hemangioma at T6, T7-8 and T8-9 disc bulges causing mild ventral impression on the thecal sac but no significant stenosis, disc degeneration at L5-S1 with no evidence of disc protrusion, herniation, or stenosis, very minimal disc bulging at C5-C6, no definitive evidence for scleroderma, and a normal neurological examination with no evidence of a nerve, muscle, or neuromuscular junction disease. Tr. at 464, 468, 471, 475, 477-79, 481, & 485-86.

In his September 2007 letter, Dr. Nichols opined that Plaintiff is unable to engage in work that requires regular use of her hands; is not capable of being a reliable employee due to tardiness, falling asleep at work, and leaving early; requires frequent rest periods during the day at unpredictable times and for unpredictable periods of time; is precluded from "productive work" because she is unable to concentrate, makes errors, and becomes stressed under pressure; is unable to climb or perform manual labor; and cannot work in cold weather.  Tr. at 463.  Dr. Nichols concludes that Plaintiff is unable to "engage in or sustain any gainful employment activity, even part-time sedentary work, now, or in the foreseeable future."  Tr. at 463.

### c.    State Agency Medical Consultant Reports

In May 2006, Cindy Osborne, DO, a State Agency Medical Consultant Physician reviewed Plaintiff's medical history and determined that Plaintiff could do light work.  Tr. at 288.  Dr. Osborne further found that Plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand or sit for 6 hours in an 8 hour workday, and could push/pull on an unlimited basis.  Tr. at 282. The State Agency Physician determined that Plaintiff could occasionally climb ramps or stairs but could never climb ladders, ropes, or scaffolds.  Tr. at 283.  Dr. Osborne found that Plaintiff could occasionally balance, stoop, kneel, crouch, or crawl.  Tr. at 283.  The State Agency Physician determined that Plaintiff had no limitations for reaching (including overhead), handling (gross manipulation), or fingering (fine manipulation).  Tr. at 284.  Dr. Osborne found that Plaintiff had no limitations to avoid noise, vibration, or hazards of machinery or heights.  Tr. at 285. However, the State Physician noted that Plaintiff should avoid concentrated exposure to extreme temperatures, wetness, humidity, fumes, odors, gases, and poor ventilation.  Tr. at 285.

In October 2006, Thomas Lauderman, DO, another State Agency Medical Consultant

Physician reviewed all the evidence in Plaintiff's file and issued a report agreeing with the May 2006 assessment by the prior State Agency Physician, as written (i.e., that Plaintiff could do light work with limitations). *See* Tr. at 289.

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence...
>
> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions. Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources...

*See* 20 C.F.R. § 404.1527(f)(2). The ALJ agreed with the assessments of the State Agency Physicians and attributed considerable weight to their opinions. Tr. at 87.

### d. Evaluating the Credibility of Plaintiff

Plaintiff asserts that the ALJ failed to give adequate reasons in questioning her credibility. Pl. Doc. 11 at 8.

> The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms...

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, ***the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record***. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4)...

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements: 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses

> or has used to relieve pain or other symptoms (e.g., lying flat on his
> or her back, standing for 15 to 20 minutes every hour, or sleeping on
> a board); and 7. Any other factors concerning the individual's
> functional limitations and restrictions due to pain or other symptoms.

*See* SSR 96-7p (emphasis added).  The ALJ used the two-step process and considered the factors

enumerated in SSR 96-7p, 20 C.F.R. §§ 404.1529 and 416.929 in evaluating Plaintiff's credibility.

Tr. at 84, 88.

### (1)      Plaintiff's Symptoms of Pain and Daily Activities

At the ALJ Hearing, Plaintiff stated that she has had the pain since 1997 or 1998.  Tr. at 58.

However, in November 2006, Plaintiff reported taking no pain medication.  Tr. at 255.  In December

2006 and April 2007, Plaintiff reported to Dr. Brar and Dr. Worthington that her only medication

was birth control.  Tr. at 410 & 414.  She advised that she did take herbals.  Tr. at 414.  At the ALJ

Hearing, Plaintiff testified that she was not on any pain medication and that she has tried various

pain medications but they did not help.  Tr. at 58.

Plaintiff's daily activities consist taking her daughter to school, going to the grocery store,

cooking dinner, doing laundry, and cleaning the bathroom.  Tr. at 63-66.  Plaintiff regularly

exercises including riding the stationary bike, walking, doing her recommended physical therapy

exercises, using small weights, and jumping on a mini trampoline.  Tr. at 59-60.

### (2)      Plaintiff's Level of Work Activity

In addition to daily activities, the ALJ considered Plaintiff's work history since her

symptoms began in 1997.  *See* Tr. at 414 (Plaintiff's complaints began after her daughter's birth).

> In determining whether you are disabled, we consider all your
> symptoms, including pain, and the extent to which your symptoms
> can reasonably be accepted as consistent with the objective medical
> evidence, and other evidence...By other evidence, we mean the kinds
> of evidence described in §§ 416.912(b)(2) through (6) and

> 416.913(b)(1), (4), and (5), and (d). **These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.**

*See* 20 C.F.R. § 416.929(a)(emphasis added). The ALJ found that Plaintiff's alleged pain symptoms do not correspond with her level of work activity. Tr. at 84-85. Plaintiff has worked as an office manager for Dr. Nichols since 1996. Tr. at 50. At the ALJ Hearing, Plaintiff testified that she "pretty much did everything." Tr. at 50. Plaintiff took the patients back, got them ready, took vital signs, performed patient care, took care of the insurance, did billing, sent out statements, obtained prior approvals, set up appointments, interviewed new employees, and did the hiring, evaluations, and firing. Tr. at 50-51. Plaintiff testified that Dr. Nichols worked seven days a week, weekends, and holidays - "all the time." Tr. at 51. However, despite Plaintiff's "extreme fatigue" since 1997 (Tr. at 305); despite experiencing pain since 1997 or 1998 (Tr. at 58); despite being diagnosed with chronic fatigue syndrome in 2001 (Tr. at 271); despite difficulties with memory and concentration since 2001 (Tr. at 273); despite developing arthralgias and mylagias in 2001 (Tr. at 273); and despite being diagnosed with Crohn's disease in May 2004, (Tr. at 305) (now in remission) (Tr. at 277), Plaintiff nevertheless was able to work between 50 to 60 hours per week from 1996 until August 2005 (Tr. at 194, 220, & 414).

### (3)    Inconsistency in Plaintiff's Alleged Level of Work Activity

In addition, the ALJ noted that Plaintiff's testimony and statements regarding her hours worked were inconsistent. Tr. at 79. In November 2005, on Plaintiff's first application for disability, she reported working 30 hours per week as she was able. Tr. at 218. In February and March 2006, on Plaintiff's applications for disability and supplemental security income, Plaintiff

reported working 50 hours per week until May 30, 2005 and then reduced her hours to 10 per week. Tr. at 194, 220, & 414.   In March 2006, on Plaintiff's work history report, she wrote that she was currently working 10 to 12 hours per day 5 to 7 days per week.  Tr. at 220.  In April 2007, Plaintiff told Dr. Worthington that she worked 50 to 60 hours a week until August 2005. Tr. at 414.  Finally, at the ALJ Hearing in October 2007, Plaintiff testified that in 2004 she started working only 15 to 20 hours per week.  Tr. at 51-53.  In summary, Plaintiff has reported at various times that in 2005 she worked 30 hours per week for the entire year; 50 hours per week until June and then 10 hours per week; 10 to 12 hours per day 5 to 7 days per week for the entire year; 50 to 60 hours per week until August and then 10 hours per week; and 15 to 20 hours per week for the entire year.  *See* Tr. at 51-53, 194, 218, 220, & 414.

Plaintiff's conflicting reported hours and wages also differ from her actual reported earnings. In March 2006, Plaintiff reported that as of June 2005 she was earning $184 per week.  Tr. at 194. The ALJ noted that $184 per week yields an annual salary of $9,568 and a monthly salary of $797. Tr. at 79.  However, Plaintiff reported the following monthly wages after her alleged decrease in work hours:  June $2,688;  July $1025;  August $1,835;  September $1,659;  October $4,100; November $2,050; and December $1,566.  Tr. at 79-80 & 207.  Therefore, Plaintiff's actual earnings in 2005 differed from the $797 per month wage that she alleged in her disability applications. Plaintiff's annual salary for 2005 was $24,797, which represents working more than only 10 hours per week since June 2005 as Plaintiff had previously alleged.  Tr. at 80 & 182.  In addition, on Plaintiff's March 2006 work history report, she reported that she was currently working 10 to 12 hours per day 5 to 7 days per week and estimated that her income for 2006 would be $24,797.  Tr. at 220.  The ALJ noted that Plaintiff's estimated income of $24,797, from working more than full-

time, accurately represents her actual 2005 wages. Tr. at 80 & 182. At the October 2007 ALJ Hearing, Plaintiff testified that she cut back on her hours in 2003. Tr. at 52-53. However, Plaintiff earned the highest salaries in 2003 and 2004, after she allegedly cut back on her hours. Tr. at 81-82. Plaintiff earned the following annual salaries while working for Dr. Nichols: 1996 - $8,348; 1997 - $11,270; 1998 - $12,955; 1999 - $18,729; 2000 - $19,473; 2001 - $20,758; 2002 - $25,603; 2003 - $28,491; 2004 - $30,827; 2005 - $24,797; and 2006 - $9,600. Tr. at 182. The ALJ found that this contradiction between alleged work hours and wages and actual reported earnings clearly raises issues concerning Plaintiff's underlying credibility. Tr. at 82.

Moreover, the ALJ found that Plaintiff's drastic cut in hours worked in January 2006 and cut in salary coincided with being denied disability benefits from her first application due to substantial gainful activity and her employer's recent semi-retirement. Tr. at 82 & 87. Plaintiff's annual salary dropped from $24,797 in 2005 to $9,600 in 2006, which is just $60 per month below the substantial gainful activity limit of $10,320. Tr. at 80. In September 2007, Dr. Nichols wrote in his letter to the ALJ that he was semi-retired and running his practice alone. Tr. at 496. At the ALJ Hearing in October 2007, Plaintiff testified that Dr. Nichols is not seeing as many patients. Tr. at 54. Finally, despite complaints of fatigue since 1997, Plaintiff reported that her condition did not first bother her or make her unable to work until June 30, 2005. Tr. at 82 & 193. The ALJ found that "the decrease in the claimant's work activity and wages appears to have coincided approximately with a juncture at which her employer was reducing his patient caseload after what appears to have been nearly 40 years of practice - although she arguably worked with largely the same symptoms since 1997." Tr. at 82.

Plaintiff states that the ALJ only identified "modest inconsistencies" in her hours worked.

Pl. Doc. 11 at 8. However, the evidences demonstrates that Plaintiff was remarkably inconsistent in reporting her hours worked; and moreover, Plaintiff's earnings did not correspond to her alleged decrease in hours. Therefore, substantial evidence supports the ALJ's conclusion that although the Plaintiff has had medically determinable impairments that could reasonably produce some of the symptoms she alleged, her other statements in the record were not entirely credible.

### e. Evaluating the Credibility of Plaintiff's Primary Treating Physician and Employer, Dr. Nichols

Plaintiff contends that the ALJ should have given Dr. Nichols' opinion controlling weight and erred in questioning his credibility. Pl. Doc. 11. at 5-8.

> Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. The ALJ is not required in all cases to give the treating physician's opinion greater weight than other evidence; rather, "the ALJ holds [the] discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir.2001).

*Johnson v. Barnhart*, 434 F.3d 650, 654 & n.5 (4th Cir. 2005). The ALJ used these factors to evaluate the credibility of Dr. Nichols.

### (1) Dr. Nichols' Treatment Relationship with Plaintiff

The ALJ noted that Dr. Nichols has been Plaintiff's primary treating doctor and employer since 1996. Tr. at 81. *See* Letter from Dr. Nichols to ALJ, Sept. 19, 2007, Tr. at 461; *see also* Work Activity Report, Tr. at 206. The ALJ noted that Plaintiff's relationship with her treating doctor is

unusual because Dr. Nichols is also her employer and took considerable interest in Plaintiff's financial condition and her disability claim.  Tr. at 85.

Dr. Nichols submitted a total of five letters on Plaintiff's behalf in connection with her disability claim.  Tr. at 290, 305, 411-12, 461-63, & 496.  In Dr. Nichols' letter of March 2007, addressed to the Chief Administrative Law Judge, Dr. Nichols requested that the ALJ give Plaintiff's hearing "priority status" due to her financial situation, and he submitted Plaintiff's financial documents including a bankruptcy order, bank statements, mortgage payment assistance, utility shut-off notices, low income heating assistance statements, delinquent medical bills, and hospital charity care agreements. Tr. at 125 & 127-58.  In Dr. Nichols' letter of September 2007, he reported that Plaintiff's salary has been reduced from $30,826 to $9,600.  Tr. at 496.  Dr.  Nichols said this is not representative of the work she performs but is comparable to a "disability payment."  Tr. at 496.  Dr. Nichols further stated that in return for her "salary," Plaintiff has agreed that whenever possible, she will "advise and assist" him as necessary.  Tr. at 496.

### (2)      Inconsistency in Dr. Nichols' Reports of Plaintiff's Level of Work Activity

In addition, the ALJ noted that Dr. Nichols has inconsistently reported Plaintiff's hours worked.  Tr. at 79.  In November 2005, on Plaintiff's first application for disability, Dr. Nichols reported that Plaintiff was working 30 hours per week as she was able.  Tr. at 218.  Dr. Nichols also reported that she was performing 60% of her required job duties.  Tr. at 218.  In September 2007, Dr. Nichols wrote in a letter to the ALJ that Plaintiff worked 60 hours per week through December 2003.  Tr. at 496.  Dr. Nichols further stated that in 2004, Plaintiff's hours were reduced in half due to her fatigue and joint / muscle pain.  Tr. at 496.  Dr. Nichols stated that in 2005, Plaintiff worked at home and averaged only 2 days per week.  Tr. at 496.  This statement by Dr. Nichols in September

2007 that Plaintiff only worked 2 days per week during 2005 differed from his earlier statement in November 2005 when he said that Plaintiff was working 30 hours per week and performing 60% of her duties. In evaluating Dr. Nichols' credibility, the ALJ compared the statements by Dr. Nichols regarding Plaintiff's hours worked with Plaintiff's actual salaries. Tr. at 81. In 2003, Dr. Nichols stated that Plaintiff worked 60 hours and her actual salary was $28,491. In 2004, Dr. Nichols reported that Plaintiff worked half the amount of hours as 2003, but her actual salary increased to $30,827. Finally, in 2005, Dr. Nichols said Plaintiff only worked a total of 2 days at home, but her salary was $24,797. The ALJ noted that in following Dr. Nichols' statements, Plaintiff would have earned $28,491[3] in 2003 for working 60 hours per week, yet she would have earned $30,827 in 2004 despite having only worked 30 hours per week. Tr. at 81. The ALJ found that this conflicting information made Dr. Nichols' credibility clearly questionable. Tr. at 81.

### (3)     Supportability and Consistency of Dr. Nichols' Medical Opinion based on the Evidence in the Record

The ALJ also considered Dr. Nichols' medical opinion concerning Plaintiff in assessing his credibility. Tr. at 83-88. In September 2007, Dr. Nichols sent a letter to the ALJ stating that in his opinion, Plaintiff is unable to "engage in or sustain *any* gainful employment activity, even part-time sedentary work, now, or in the foreseeable future." *See* Tr. at 463 (emphasis added).

> A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources. Controlling weight ***may not be given*** to a treating source's medical opinion ***unless the opinion is well - supported*** by medically acceptable clinical and laboratory diagnostic techniques.

---

[3] The ALJ quoted $25,603, but the correct figure is $28,491. Tr. at 182.

SSR 96-2p. The ALJ found that Dr. Nichols' opinion that Plaintiff could not do any work was not supported by a review of the medical evidence in the record and Plaintiff's own significant work history. Tr. 83-88. The record establishes that Plaintiff was able to work between 50 to 60 hours per week from 1996 until August 2005 (Tr. at 194, 220, & 414) despite "extreme fatigue" since 1997 (Tr. at 305); despite experiencing pain since 1997 or 1998 (Tr. at 58); despite being diagnosed with chronic fatigue syndrome in 2001 (Tr. at 271); despite difficulties with memory and concentration since 2001 (Tr. at 273); despite developing arthralgias and mylagias in 2001 (Tr. at 273); and despite being diagnosed with Crohn's disease in May 2004, (Tr. at 305) (now in remission) (Tr. at 277).

In December 2006, Dr. Brar, M.D., a rheumatologist, evaluated Plaintiff for her complaints of fatigue. Tr. at 410. Plaintiff told Dr. Brar that she has had these complaints since 1997. Tr. at 410. Plaintiff said that her only current medication was birth control. Tr. at 410. Dr. Brar diagnosed Plaintiff with chronic fatigue syndrome / fibromyalgia. Tr. at 410. Dr. Brar's recommended treatment was a program of muscle toning and muscle strengthening and to continue her current medications (i.e., birth control). Tr. at 410. In February 2007, Dr. Brar wrote a brief letter stating Plaintiff could work on a part-time basis. Tr. at 409. Even though this was the first "official" diagnosis of fibromyalgia, Plaintiff has complained of arthralgias and mylagias since 2001. Tr. at 273. In addition, Plaintiff told Dr. Brar that she has had these complaints since 1997. Tr. at 410.

In April 2007, Dr. Worthington conducted a "Comprehensive Psychiatric Evaluation." Tr. at 414-17. Plaintiff told Dr. Worthington that she has been very tired since after her daughter's birth in 1997. Tr. at 414. Plaintiff advised that until August 2005, she was working 50-60 hours per week. Tr. at 414. Dr. Worthington diagnosed Plaintiff with adjustment disorder but reported that

Plaintiff is not showing signs or symptoms of depression. Tr. at 415. Dr. Worthington did not think it was appropriate to prescribe medication. Tr. at 415.

Therefore, the ALJ found from Plaintiff's medical evidence and work history that Plaintiff has worked 50 to 60 hours per week from 1997 until August 2005 with substantially the same complaints as she currently alleges in her claim for disability. Tr. at 88. The ALJ found that this level of work activity contradicts Dr. Nichols' medical opinion that Plaintiff cannot perform any type of work. Tr. at 85. In evaluating the credibility of Plaintiff's primary treating doctor, the ALJ found that Dr. Nichols appeared to be more of an "advocate" rather than a credible, objective, or reliable source of Plaintiff's medical condition. Tr. at 88. Moreover, the ALJ found that the inconsistencies in the information provided by Plaintiff and her physician / employer invited the conclusion that Plaintiff suddenly could no longer work only once Dr. Nichols decided to reduce his workload and semi-retire. Tr. at 85. Substantial evidence supports the ALJ's decision that Dr. Nichols was not entirely credible and to give his opinion no controlling weight.

### f.      Residual Functional Capacity Assessment Conclusion by the ALJ

In assessing Plaintiff's residual functional capacity, the ALJ considered the medical evidence in the record; the state agency consultant reports; the credibility of Plaintiff including symptoms of pain, daily activities, level of work activity, and inconsistency in Plaintiff's alleged level of work activity; the credibility of Plaintiff's primary treating physician and employer, Dr. Nichols, including his treatment relationship with Plaintiff, the inconsistency in his reports of Plaintiff's level of work activity, and the supportability and consistency of his medical opinion based on the evidence in the record. In considering all these factors, the ALJ found that Plaintiff could perform light work with

limitations.[4]  Tr. at 83-84.  The ALJ found that the light work assessment was consistent with the reports by the State Agency Physicians.  Tr. at 87.  Accordingly, substantial evidence supports the ALJ's Residual Functional Capacity Assessment that Plaintiff can perform light work.

### 4.    Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant work.  If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).)  If you can still do this kind of work, we will find that you are not disabled.
> See 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform her past relevant work as a nurse aid and office manager because they entail levels of complexity and associated stress that exceed her residual functional capacity.  Tr. at 88.  The parties do not dispute the ALJ's findings in Step Four.

### 5.     Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work

---

[4] Specifically, the ALJ found that Plaintiff had the residual functional capacity to perform a range of "unskilled" work activity within a low stress environment that requires no more than light exertion; that affords the option to sit or stand; that requires no climbing of ladders, ropes, or scaffolds, or more than occasional performance of other postural movements; that requires no constant or repetitive fine manipulation maneuvers; that entails no concentrated exposure to temperature extremes or environmental pollutants (e.g., dust, fumes, gases, noxious chemicals / odors, smoke); that entails no exposure to hazards (e.g., dangerous moving machinery, unprotected heights); that entails no production line type of pace, independent decision making responsibilities or supervisory duties; and that involves only routine and repetitive instructions and tasks.  See supra Section II.D.* Residual Functional Capacity Assessment * of this Report and Recommendation; see also Tr. at 83-84.

At the fifth and last step...

> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff could perform any other work.

### a. The ALJ Considered Plaintiff's Age, Education, and Work Experience

The ALJ noted that Plaintiff was 37 years old on the date of her hearing in October 2007, which makes her a younger individual as defined in the Social Security Act. Tr. at 89. *See* 20 C.F.R. § 404.1563 (age as a vocational factor). The ALJ found that Plaintiff has a high school education and no transferable job skills. Tr. at 89. *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills). The parties do not dispute these findings.

### b. The ALJ Considered Plaintiff's Limitations from the Residual Functional Capacity Assessment and Vocational Expert Testimony

The ALJ found that Plaintiff's residual functional capacity assessment had exertional and nonexertional limitations and therefore necessitated taking vocational expert testimony. "It is well established that an ALJ may not rely solely on the grids, but must instead call on the testimony of a vocational expert, where "nonexertional limitations...occur in conjunction with exertional limitations." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987). *Lyall v. Chater*, 60 F.3d 823 (4th Cir. 1995). Vocational Expert Eugene Czuczman testified that someone with Plaintiff's residual functional capacity would be able to perform "light exertional" jobs such as cleaner / polisher, folding machine operator, and photographic machine operator. Tr. at 69. Mr. Czuczman stated that there were at least 200 to 500 of these types of jobs available in the state of West Virginia and 75,000 to 80,000 jobs available nationwide. Tr. at 69. Mr. Czuczman testified that Plaintiff could also perform "sedentary"[5] jobs such as type copy examiner, plastic design applier, and laminator. Tr. at 69. Mr. Czuczman stated that there were at least 300 to 400 of these types of jobs available in the state of West Virginia and 60,000 to 70,000 jobs available nationwide. Tr. at 69.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and the vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff could perform. Tr. at 90. Substantial evidence supports the ALJ's decision that Plaintiff could perform other work.

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met...If someone can do light work, we determine that he or she can also do sedentary work." 20 C.F.R. § 404.1567.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform other work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's applications filed on February 28 and March 2, 2006, the Plaintiff is not entitled to a period of disability, disability insurance benefits, or supplemental security income. Tr. at 90. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform other work in the national economy.

### III.    RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[12]**, **DENY** Plaintiff's Motion for Summary Judgment **[10]**, and **AFFIRM** the Decision of the Administrative Law Judge. The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel

of record may file with the Clerk of the Court any written objections to this Recommendation. The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the Honorable John P. Bailey. Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: July 20, 2009**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE